# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 27, 2015

## STATE OF TENNESSEE v. SUSAN JO WALLS

**Appeal from the Circuit Court for Bedford County**
**No. 17626    Forest A. Durard, Jr., Judge**

_____

**No. M2014-01972-CCA-R3-CD – Filed April 7, 2016**

_____

The Defendant, Susan Jo Walls, was convicted by a jury of being criminally responsible for the first-degree premeditated murder of her husband and of conspiring with others to commit said murder. The trial court imposed an effective sentence of life imprisonment for these convictions. In this direct appeal, the Defendant argues that (1) the evidence was insufficient to support her convictions; (2) the trial court erred in allowing late-night jury deliberations; (3) the trial court erred by denying her motion to suppress an involuntary statement made to law enforcement; (4) the trial court failed to properly sanction the State for its untimely disclosure of certain phone records; (5) the trial court abused its discretion by denying her motion for a mistrial or to strike a witness's testimony based on an alleged <u>Jencks</u> Act violation; and (6) the trial court erred by modifying the jury instructions in response to a jury question that was presented after deliberations had commenced.[1] Because we conclude that the trial court erred by allowing jury deliberations to continue into the late-night hours, we reverse the judgments of the trial court and remand this case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Christopher P. Westmoreland, Shelbyville, Tennessee, for the appellant, Susan Jo Walls.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Robert J. Carter, District Attorney General; and Richard A. Cawley

---

[1] For the sake of clarity, we have combined and reordered several of the issues as presented by the Defendant in her appellate brief.

and Michael D. Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case presents a murder-for-hire or contract killing scenario. On April 15, 2013, a Bedford County grand jury charged the Defendant with criminal responsibility for the first-degree premeditated murder of her husband, Larry Walls, Sr. ("the victim"), based upon her participation in the killing and with conspiring along with Jason Starrick, Sean Gearhardt, and Dawn Walls, daughter of the Defendant and the victim, to commit said murder. See Tenn. Code Ann. §§ 39-11-402, -12-103, -13-202. The murder occurred on the morning of August 8, 2012, taking place inside the Defendant's and the victim's Bedford County home, where they resided with two of their four children, Larry Walls, Jr., and Aelisa Walls Stacy, and with Aelisa's[2] four young children.

At the Defendant's multi-day trial in May 2014, the State's proof showed that the Defendant and Dawn had discussed on many occasions having the victim, who was an alleged long-time abuser of multiple family members, killed. Apparently conversations such as these had taken place for over a decade but did not result in a definitive plan. Testimony revealed that the victim often beat the Defendant, Dawn, and Larry Jr., and sexually molested Dawn and possibly one of Aelisa's children.

One such conversation occurred on Memorial Day weekend 2012 at Dawn's apartment, when her parents came to visit for the weekend. Dawn had a roommate, Chrissy Twilley, and Twilley's boyfriend, Starrick, also lived with them; Twilley and Starrick were present for this Memorial Day visit from Dawn's family. When the Defendant arrived at the apartment that weekend, she had noticeable bruising on her arm from where the victim had hit her, according to Dawn. Dawn said that Starrick observed these bruises and gave the victim "looks" while he was there. At some point in the evening, Starrick, Dawn, and the Defendant had a conversation; an exchange that was overheard by Twilley. Dawn said that she wished her dad was dead, and her mother "agreed to it[,]" wishing he was too. Starrick joined the conversation and said "he [could] take care of it." Dawn testified that there was then "talk about maybe throwing [her father] off the balcony[.]" Twilley recalled the three discussing money that evening and possible methods of killing the victim, like "poison and accident[.]" Dawn stated at trial that, although she believed that Starrick was serious when he said these things, no decisive plan was set into motion that evening. However, according to Dawn, later that

---

[2] Because several of the individuals involved in this case share a common surname, we will refer to those individuals in this opinion, including Aelisa Walls Stacy, by their given names. No disrespect is intended in so doing.

evening the Defendant and Starrick had a private conversation on the balcony, and Dawn testified that she again spoke with Starrick about killing her father shortly after that weekend.

Aelisa testified at trial that she was living with her boyfriend, Joseph Williams, in July 2012, and one evening her mother came by for a visit "and started talking about [her] father[.]" The Defendant and Williams went into the back room to smoke some marijuana because the Defendant was upset, and once there, the Defendant told Williams that she was going to have someone kill the victim because he had hit her. Williams described that the Defendant's "eye was kind of a little puffy red . . . , like somebody had hit her." Williams claimed that the Defendant said "she had it taken care of and that she had some guys that [were] going to come down and slit [the victim's] throat." Williams continued, "I thought at the time that she said Dawn's boyfriend, but it was Dawn's roommate. You know the guy whose daddy or whoever was in the mafia and [the Defendant] could have him killed and pay him later." Williams, being concerned, talked with Aelisa after this conversation with the Defendant, but due to these types of frequent statements by the Defendant, Aelisa did not believe these statements by her mother and did not take her seriously.

Larry Jr. testified that, about a month prior to the murder, his mother said that she wished the victim was dead. Additionally, Twilley recalled a time where Dawn and Starrick were in her presence, and Dawn was speaking on the phone with the Defendant. According to Twilley, they were again talking about "humane" methods of killing the victim.

Dawn testified that she ultimately arranged with Starrick to have the victim killed for the sum of $400, with both Dawn and the Defendant each agreeing to pay $200. The plan was for Starrick to commit the murder on August 8, 2012, and Dawn paid Starrick $70 upfront and supplied Starrick with a debit card to buy supplies with which to complete the murder. Dawn testified that she and her mother discussed the plan over the phone several times and sent text messages back and forth. According to Dawn, while some of these text messages were sent to and from the Defendant's cellular telephone, others were communicated by way of her sister Aelisa's phone because the Defendant had run "out of minutes[,]" so the Defendant had borrowed Aelisa's phone. Aelisa confirmed at trial that the Defendant borrowed her phone often, but she claimed that she never saw any of the incriminating text messages, opining that the Defendant had deleted them.

Specifically, Dawn said that the she communicated with her mother by text message on August 1, 2012, by sending messages to Aelisa's phone. Aelisa's phone was

in the Defendant's possession on that date according to both Dawn and Aelisa. That evening Dawn texted to her mother[3]:

> 5:28 p.m.—What is fuckn wrong with him well me and jason were just talken and we are planing it for next week we have to have a hunderd up front bc that way

> 5:29 p.m—He can have things he needs to get so that he can do it so u need to let me know when he is home alone

> 5:34p.m.—We will I got this ok love u guys

> 5:37 p.m.—When does he go down to the garden

> 5:40 p.m.—I just called u answer

When asked what prompted her to text these messages to her mother, Dawn said, "My mom said that my dad sexually molested my nephew[.]"[4] According to Dawn, the Defendant "agreed to" the scheme about having her father killed.

On the evening of August 7, 2012, the day before the murder, Gearhardt, Starrick, and Twilley accompanied Dawn to the home of the Defendant and the victim, utilizing this visit to show the location and layout of the home to Gearhardt and Starrick. Both Larry Jr. and Aelisa were home when the group arrived. According to Aelisa, she had a conversation with her mother and Dawn by the swing set at her parents' house that evening. Aelisa testified that Dawn and the Defendant said to her that "they wanted to get rid of [the victim,]" and they explained to her why "this other group" had come to the house that night—because two men "were going to come the next day" to do just that. However, Aelisa claimed that she did not believe her mother on this occasion either, but she did ask her mother not to do it.

The plan between Dawn and the Defendant also included taking Aelisa and her children back to Dawn's apartment that evening, so that Aelisa and her kids would not be present the following morning when Gearhardt and Starrick arrived to commit the murder. Aelisa and her children did return with Dawn to her apartment that evening and stayed the night there, along with Gearhardt, Starrick, and Twilley.

Around 5:35 a.m on the morning of August 8, 2012, the Defendant left her home to take Larry Jr. to work in Murfreesboro, and they stopped at a BP gas station while en

---

[3] In an effort to effectuate the exact meaning of the text messages quoted herein, we will not alter the vernacular used between the two women in any way.

[4] This is a reference to Aelisa's son.

route.  The Defendant returned home after dropping off Larry Jr.  Dawn and the Defendant were exchanging text messages that morning; they had agreed to take Aelisa and the kids to Chuck E. Cheese's in Nashville, while Gearhardt and Starrick killed the victim, in order to establish an alibi.

The State questioned Dawn about the content of the text messages between her and her mother on the morning of August 8, 2012.  That morning, beginning at 5:50 a.m. and continuing until 7:05 a.m., the following exchange took place between the two women:

Dawn:  Mom u up

The Defendant:  Ya

Dawn:  Are u going to take little larry to work

The Defendant:  Here in a t 630

Dawn:  Are still comeing up here and going to chakie chesse with us

The Defendant:  Just droped larry off have to go back to home will tey you let you know

Dawn:  Why[5]

Dawn:  No dont go back they are on there way down there go to melissa

The Defendant:  He is in a pissy mod will tex you as soon as i can

Dawn:  Ya i will u going to melissa house

The Defendant: Ya

Dawn:  K

The Defendant:  Will tex you as soon as i can dont tex me he might think something is up

Dawn:  Who? Are u at melissa house

The Defendant:  No home will let you know

---

[5]  According to Dawn, Aelisa was typing and sending the majority of these text messages under Dawn's direction.  However, Dawn said that this message was sent by Aelisa under her own volition.

Dawn:  Holle[6]

Dawn:  They are on there way leave

The Defendant:  I am at the house will let you know when i leave he is up dont tex me will tex you

Dawn:  Ok

The Defendant:  Will let you know dont tex me any more he might think we are up to something

No further text messaging exchanges occurred that morning between them, according to Dawn, but the Defendant did not arrive at Dawn's apartment until around 10:00 a.m. that morning.

Dawn saw Gearhardt and Starrick leave her apartment that morning sometime around 6:00 a.m., but she did not speak with them.  After leaving the apartment, Gearhardt and Starrick purchased gas at a local Mapco station and items at a Nashville Wal-Mart using the debit card furnished by Dawn.  Wal-Mart receipts reflected that they purchased bandanas, rubber gloves, ammonia, and drinks.  The foursome had agreed that the murder should look like a robbery.

Aelisa was still at Dawn's apartment on the morning of August 8, when her mother arrived.  Aelisa testified that she overheard Dawn and her mother having a conversation before Gearhardt and Starrick returned to the apartment.  According to Aelisa, the Defendant asked Dawn if she was "sure she wanted to do it[,]" and Dawn said, "[N]o."  The Defendant responded that "[s]omething had to be done."  Aelisa also heard Dawn ask her mother if she had the rest of the money for Starrick, but the Defendant said that "[s]he didn't know."

Dawn testified that, when Starrick and Gearhardt later returned to the apartment, Gearhardt had "a little bit of blood on him" and Starrick returned the debit card to Dawn.  Twilley said that, when the two men returned, she observed "tissue, bloody pulp" on Starrick's face and blood on his forearm and a "streak of blood" on Gearhardt.  According to Twilley, the men spent "considerable time in the bathroom" cleaning up.

After Starrick's and Gearhardt's return, Dawn, accompanied by the Defendant, went to a nearby gas station and used the same debit card to get cash, so they could have money for Chuck E. Cheese's.  Dawn and the Defendant retrieved Aelisa and her

---

[6] Dawn testified that this was another message sent by Aelisa herself, not with Dawn's guidance.

children from the apartment and left around 11:00 a.m., going to Chuck E. Cheese's as previously planned. Dawn testified that she and her mother briefly spoke with Gearhardt and Starrick before leaving for the restaurant and that "they just said it was done[.]" Also, Gearhardt came to see the women at Chuck E. Cheese's, and according to Dawn, he again told them "it was done." Dawn said that she, her mother, and Aelisa departed the restaurant and arrived back at the apartment at approximately 1:30 p.m. According to Twilley, once back from Chuck E. Cheese's, Starrick, Dawn, and the Defendant talked about who should find the victim's body. Starrick opined that it should be Larry Jr. because he was not involved in the killing, but Dawn and the Defendant did not want this to happen.

Dawn and the Defendant intended to return to the Defendant's and the victim's residence themselves, so they left Dawn's apartment a few minutes later, accompanied by Aelisa and her children. Before arriving back at the couple's Bedford County home, they let off Aelisa and her children at Melissa Walls' house, who was also a daughter of the victim's and the Defendant's. They left them at Melissa's house under the pretense of getting some ice cream from the Defendant's and the victim's home, which was nearby, with the intention of quickly returning because they did not want the children to be present when the victim's body was discovered. When Dawn and the Defendant ultimately arrived back at the Defendant's and the victim's home, Dawn phoned 9-1-1 and reported a robbery, but she made no mention of the deceased victim inside. The police were dispatched at 2:27 p.m. to respond to this non-emergent call.

Upon arrival at the residence at approximately 2:53 p.m., Bedford County Deputy Sheriff Tim Fox met the Defendant and Dawn in the driveway and learned that the victim had been found brutally murdered inside the home. Upon entering the residence, the kitchen had "been ransacked a little bit[,]" according to Deputy Fox. Deputy Fox made his way to the couple's bedroom where he found the victim with "his shirt off and his hands up in a defensive position[.]" Deputy Fox described the scene as "pretty gruesome" due to the amount of blood on the body, walls, floor, and furniture in the room.

Tennessee Bureau of Investigation ("TBI") Special Agent Caleb Utterback arrived at the residence between 4:30 and 5:00 p.m. to further investigate the murder. Based upon his observations inside the home, a robbery had not actually taken place, and the scene appeared to be "staged." There were no signs of forced entry. Also, while at the residence, Agent Utterback listened to the 9-1-1 tape in his police cruiser; he thought it was odd that Dawn provided "her alibi for the day" to the dispatcher when placing the call. The Defendant was audible on the phone call, but she sounded distressed, in Agent Utterback's opinion, and Dawn grabbed the phone from her.

TBI Special Agent Andrew Kon was also on the scene and assisted in the investigation. Agent Kon interviewed the Defendant in the back of a patrol car there at the residence during the early evening hours of August 8, 2012. The Defendant did not incriminate herself at this time, claiming that she "[had] no idea what happened" and that she had "a good relationship with her husband[.]" That statement was later reduced to writing and signed by the Defendant at 7:45 p.m.

Dawn and the Defendant stayed at the residence while the investigation continued until the early morning hours of August 9, 2012, when they left to go stay at the home of Tasha Groves, another family member. Once at Ms. Groves's house, the Defendant and Dawn discussed remorse due to the violent nature of the victim's death because they had requested "something simple, like a smothering." Agent Kon came to Ms. Groves's residence around noon on August 9 and took both Dawn's and the Defendant's cellular telephones for analysis.

Agent Kon called Ms. Groves later in the evening on August 9 and spoke to Dawn and the Defendant, asking them to come down to the TBI's "Shelbyville field office to retrieve their phone[s]." Ms. Groves drove Dawn and the Defendant there. Once they had arrived, the agents asked to speak with the two women further and separated them for interviews. The women were assured "that no matter what was said they would go home that night[,]" and thereafter, both Dawn and the Defendant gave statements to the police implicating themselves in the murder of the victim. The Defendant's statement was again reduced to writing, and she signed it at 12:50 a.m. on August 10. When the Defendant and Dawn were ready to leave the TBI's office, Ms. Groves was no longer there, so the officers gave the two women a ride. Based upon the contents of their statements, their cellular telephones were not returned.

Once back at Ms. Groves's home, the agents, now into the early morning hours of August 10, had Dawn place a recorded phone call to Starrick. They had her place this call in an attempt to "verify the information in the statements" and have Starrick "talk about the details of the killing and the details of the money exchange." However, Twilley, not Starrick, answered the telephone. When Dawn brought "up the subject of wanting to pay [Starrick] some money[,]" Twilley hung up.

Crystal McBride, a friend of the Defendant's for twenty-four years, testified that she went to see the Defendant at Ms. Groves's house upon learning that the victim had been murdered. She asked the Defendant, "[D]id you do this?" and the Defendant, placed her hands on her head, saying that "she was responsible for some action in it." According to Ms. McBride, the Defendant, after being hit by the victim, "just kind of snapped and just couldn't take it no [sic] more." Ms. McBride detailed the conversation with the Defendant:

She stated that when she got beat up two weeks ago she was feed [sic] up with it. She was talking to Dawn who told her I know people and can get it done. [The Defendant] said Dawn kept asking and pushing and finally [the Defendant] stated she told Dawn okay. She was tired of it. She then stated "it wasn't supposed to go down like this." I then asked what did you hire him to do and her reply was to kill him but not to mutilate him the way they did. She told me that Dawn gave him $70 dollars before and was gonna [sic] give him the rest of it after. She said the total was going to be $450. She didn't tell me who "he" was that Dawn gave the money to.

Aelisa testified that she went to Ms. Groves's residence and spoke with the Defendant on August 12, 2012. According to Aelisa, her mother confessed that "she had something to do with" the murder of the victim, but the Defendant did not provide any details. Aleisa thereafter decided to go talk to the TBI about what she knew, providing a written statement.

Ms. McBride testified that she again spoke with the Defendant a few weeks after the murder. During this conversation, Ms. McBride asked the Defendant if she regretted what she had done, and the Defendant said only "in part because she knew that he would never be able to hurt another child or person again."

An autopsy of the victim was performed, and it was determined that the victim endured multiple stab wounds—"forty-nine sharp force injuries"—and repeated blunt-force head trauma, causing his death. Agent Utterback described the manner of death as "very violent[.]"

Some of Dawn's, the Defendant's, and Aelisa's cellular telephone records on the relevant dates in question were entered into evidence at trial. Forensic analysis confirmed that several of the incriminatory text messages had been deleted.

The defense recalled Aelisa. Aelisa testified that she had a phone conversation with Williams just after the murder and that, during that call, she stated to Williams that she did not believe her mother was involved in her father's murder.

Next, Ms. Groves testified for the defense. Ms. Groves stated that she picked up the Defendant, Dawn, and Larry Jr. from the Defendant's and the victim's residence around 2:00 a.m. on August 9, 2012. According to Ms. Groves, the Defendant did not sleep at any time prior to interview with the TBI that occurred later on August 9 at the TBI's office. Furthermore, according to Ms. Groves, while waiting at the TBI's office with Dawn and the Defendant, an agent told her to leave and said that she would be called if the two women were allowed to go home. Ms. Groves agreed that the Defendant

was never placed in handcuffs and that, at one point, Dawn emerged from her interview to smoke a cigarette.

Melissa Walls also testified on her mother's behalf, recalling the violence in their family and stating that all members of the family had desired the victim dead at one time or another. On cross-examination, Melissa agreed that the Defendant had once stated that she wished she could find someone to kill the victim, but Melissa explained that she did not believe the Defendant, who was just "mad talking[.]"

After the conclusion of proof, the jury convicted the Defendant as charged. The Defendant was sentenced to concurrent terms of life imprisonment for the murder conviction and twenty-one years for the conspiracy conviction. This timely appeal followed.

## ANALYSIS

On appeal, the Defendant challenges (1) the sufficiency of the convicting evidence; (2) the lateness of the hour until which jury deliberations continued; (3) the trial court's denial of her motion to suppress her statement at the TBI's office as involuntary; (4) the trial court's failure to issue appropriate sanctions against the State for its untimely disclosure of phone records; (5) the trial court's denial of her motion for a mistrial or to strike Aelisa's testimony based on an alleged Jencks Act violation; and (6) the trial court's modification of the jury instructions in response to a jury question posed after deliberations had commenced. We will address each in turn.

### I. Sufficiency

The Defendant argues that the evidence was insufficient to support her convictions for first degree murder and conspiracy to commit first degree murder,[7] contending that, "[t]hroughout the trial[,] all the evidence of action or initiation of events pointed to Dawn Walls." Stated another way, "[a]ll the planning, communication, direction, information, compensation, transportation, misdirection and timing of the offense was under the singular control of Dawn Walls." The Defendant continues, "No witness could ever show or state that the [D]efendant had any direct or indirect communication with either Jason Starrick or Sean Gearhardt in order to consummate the agreement or conspiracy." The State replies that sufficient evidence was presented to support the Defendant's convictions, submitting that the evidence was sufficient to prove that the Defendant helped plan her husband's murder and provided assistance and money, promising to pay

---

[7] Although the Defendant's argument seemingly applies only to the conspiracy conviction, she does generally challenge both convictions.

more money after the act was complete, to ensure that he would be killed. We agree with the State.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, to obtain a conviction for first degree premeditated murder, the State had to show "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). For the purposes of this crime, "premeditation" is an act done after the exercise of reflection and judgment. "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

The State contended at trial that, although the Defendant was not present at the murder, she was, nevertheless, guilty of first degree premeditated murder under the

-11-

theory of criminal responsibility. Under Tennessee law, a person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense." Tenn. Code Ann § 39-11-401, Sentencing Comm'n Cmts. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. See id. To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating the commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. Tenn. Code Ann. § 39-12-103(a). It is also required that "an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." Tenn. Code Ann. § 39-12-103(d).

The essential feature of the crime of conspiracy is the accord—the agreement to accomplish a criminal or unlawful act. See State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998); State v. Hodgkinson, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989). A formal agreement is not required, nor must it be expressed; it may, and often will be, proven by circumstantial evidence. See Pike, 978 S.W.2d at 915; State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); State v. Gaylor, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992) ("[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement"). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in

every detail of execution." Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

The Defendant does not contest the element of premeditation, and as this court has noted, it is "difficult to perceive of any murder-for-hire or contract killing which does not necessarily involve the act of premeditation, i.e., that the killing occurred after the exercise of reflection and judgment." State v. Lemar J. White, No. W2004-00276-CCA-R3-CD, 2005 WL 331384, at *3 (Tenn. Crim. App. Feb. 11, 2005). The Defendant maintains that no proof was adduced connecting her to the murder of her husband, that all evidence pointed to Dawn and only Dawn. We disagree.

Importantly, the Defendant ignores her own statements that she was involved in the planning of and preparation for the killing. Joseph Williams testified that, in July 2012, he observed the Defendant with an injured eye when she arrived at the residence he shared with Aelisa. Because the Defendant was upset, he accompanied the Defendant into the back room to smoke marijuana. While there, the Defendant talked of murdering the victim, saying to Williams that "she had it taken care of and that she had some guys that [were] going to come down and slit his throat." Williams "thought at the time that she said Dawn's boyfriend, but it was Dawn's roommate." The Defendant also told Williams that the killer would allow her to pay later.

Aelisa testified that, on the evening before the killing, August 7, she had a conversation by the swing set at her parents' house with her mother and Dawn. According to Aelisa, Dawn and the Defendant said that "they wanted to get rid of [the victim]" and explained that two men "were going to come the next day" to do just that and that was why "this other group" came to the house that night. Aelisa was also present when her mother arrived at Dawn's apartment the following morning, and she testified that she overheard the Defendant ask Dawn if she was "sure she wanted to do it[,]" and Dawn said, "[N]o[,]" but the Defendant insisted that "[s]omething had to be done." Aelisa also heard Dawn ask her mother if she had the rest of the money for Starrick, but the Defendant replied that "[s]he didn't know." Finally, Aelisa testified that she spoke with her mother at Tasha Groves's residence on August 12, 2012, and that her mother confessed that "she had something to do with" the murder of the victim.

A long-time friend of the Defendant's, Crystal McBride, also testified that the Defendant accepted responsibility for the murder, explaining that the Defendant "just kind of snapped and just couldn't take it no [sic] more." Ms. McBride gave a statement that included details of the killing provided by the Defendant. Those details included that the killer was someone Dawn knew, that she agreed with Dawn to go ahead with the killing, that the killer was given seventy dollars upfront, and that the total sum to be paid to the killer was four hundred and fifty dollars. A few weeks later, Ms. McBride again

-13-

spoke with the Defendant, who said that she regretted murdering her husband only "in part because she knew that he would never be able to hurt another child or person again."

In the Defendant's second statement to Agent Kon, she said that she called Dawn after the victim hit her and that Dawn could tell she was upset. The Defendant continued,

> Dawn said that something needed to be done. [Starrick] was living with Dawn, and I could hear his voice in the background. Over the next few days, Dawn told me that [Starrick] would kill [the victim] for me, and he wanted $400.00 to do it. I said I could pay $150 to $200, but I never gave him a dime. . . . At first I told Dawn I didn't want to, but I did want to. . . . [Starrick and Gearhardt] were supposed to go in and kill [the victim]. . . . I fully expected to find [the victim] dead inside the house when we went in.

While much of the Defendant's statement to Agent Kon is self-serving and places the blame with Dawn, these statements show that the Defendant knew the killing was going to occur and that she agreed to pay half of the compensation to Starrick. The fact that the money was never paid does not benefit the Defendant, as the testimony reflected that the agreement was for payment to be made at a later time.

Chrissy Twilley testified that, on Memorial Day weekend 2012, she overheard Dawn, the Defendant, and Starrick discussing Starrick's compensation for the killing and possible methods of killing the victim, like "poison and accident[.]" Twilley recalled another time when Dawn and Starrick were in her presence and Dawn was speaking on the phone with the Defendant, and they were again talking about "humane" methods of killing the victim. Contrary to the Defendant's assertion, Twilley's testimony established both direct and indirect communication with Starrick.

The jury also had for its consideration the content of the text messages between the several telephones, which mention the time of the killing, who will be performing the killing, that some compensation was to be paid beforehand, the need for details of the victim's schedule, and the proposed alibi. The Defendant's contention at trial that she did not participate in these messages was rejected by the jury; both Aelisa and Dawn testified that the Defendant was the person in possession of Aelisa's phone at the time on August 1, 2012, when the incriminating messages were sent. The Defendant and Dawn communicated directly on the morning of the murder, discussing the ongoing timing of events. The jury was entitled to interpret the text messages as evidence of the Defendant's motive and intent.

All of the evidence cited above is in addition to Dawn's testimony, which clearly established that Dawn and the Defendant were co-conspirators, both being involved in the planning and promoting of the murder. Both the Defendant and Dawn were victims

of abuse at the hands of the victim, and both mutually desired the elimination of the victim. The Defendant went to Dawn's apartment before the murder while Gearhardt and Starrick murdered the victim; the Defendant and Dawn took Aelisa and her children to Chuck E. Cheese's together; and the Defendant and Dawn returned together to find the victim dead. The Defendant's conviction for first degree premeditated murder was supported by sufficient proof of her criminal responsibility for the victim's death, and her conviction for conspiracy to commit first degree murder was supported by sufficient proof of an agreement to commit the murder. See, e.g., State v. Abbigail Morton, No. W2005-00308-CCA-R3-CD, 2006 WL 889579, at *8-11 (Tenn. Crim. App. Apr. 5, 2006) (affirming convictions for criminal responsibility and conspiracy under similar murder-for-hire scenario involving a husband and wife). This issue is without merit.

## II. Late-Night Deliberations

The Defendant contends that the trial court erred when it "fail[ed] to grant a continuance after a medical emergency arose with the [D]efendant prior to the jury receiving instructions and the commencement of deliberations." The State responds that "[t]he trial court's decision to await word on the [D]efendant's medical status was prudent under the circumstances and was within the discretion of the trial court" and, moreover, that "[t]he Defendant never objected to the nighttime jury deliberations[,]" thus, waiving the issue of the lateness of the hour.

At the conclusion of closing arguments, the Defendant experienced high blood pressure of 210/120, and she was transported to the hospital for evaluation at 4:04 p.m. The trial court then opined,

> So that begs the question: where does that leave us? Over the [D]efendant's objection I'm a little reluctant to do this, but I could charge the jury and begin deliberations. I don't know if that's a wise course of action . . . . Of course, when the jury returns a verdict, she would certainly need to be here. We have no idea when she may return.

Defense counsel then lodged an objection to "any further action" without the Defendant present. The prosecution then suggested "another option": "We can, if they're going to take her to the hospital now, we can just wait a little while and see if her blood pressure comes back down and then proceed." The trial court then stated, "I don't mind giving it a little bit of time."

At that time, it was noted that, if it became necessary for the trial to be continued, one juror had a grandchild's graduation to attend the following day. The following colloquy ensued:

-15-

[DEFENSE COUNSEL]: As far as excusing, I don't have a problem excusing her.

THE COURT: Okay.

[PROSECUTOR] RANDLES: I would say don't do any excusing right now, just you can go talk to the jury and tell them there's an unwanted delay that's the fault of no one and it's just going to be—I assume she's going to be at the hospital for an hour or two.

[DEFENSE COUNSEL]: If she's going to be—and I think you know the [State] may be correct here. And based on my experience, I've never been in the hospital where it took twenty or thirty minutes for a turn around, especially not when your blood pressure is that high. They always want to make sure that whatever they've administered that you don't drop too low and that kind of thing. So if it's going to be two hours, which sounds like a long time, two hours. Especially, then to come back in after two hours, if she's even here, we're going to have another thirty, forty minutes based on what we expect the charge to be and then they're going to start deliberating at seven o'clock at night?

THE COURT: Yeah, it's going to take me thirty, forty-five minutes to read this charge.

[DEFENSE COUNSEL]: It sounds to me, based on where we are, is that the best thing to do would be to adjourn until tomorrow and start fresh in the morning. I don't have a problem dismissing the juror that needs to go to Knoxville. I have no problem at all.

THE COURT: Alright, first thing, let's—what do you have to say about bringing [the alternate juror] in here and me excuse her and then I'll discuss with the other jurors there's been a situation that is just beyond our control. Thoughts?

[PROSECUTOR] RANDLES: I'm all for jury waiting and starting deliberations at seven o'clock. I mean it's nothing new to any of us.

[PROSECUTOR] CAWLEY: Yeah, we've been here much later than that.

THE COURT: Alright. Well, we can give him—let's just play it by ear for a short period of time and call him and see what the hospital's saying in just a little bit. If it's going to be you know a considerable amount of time, I'm

-16-

not—and I understand what the [State's] saying, but we've had these guys up here and this is the, what, fourth day.

The trial court then excused the juror with a conflict, which left fourteen potential jurors remaining. No further discussion took place on the record.

The transcript reflects that the jury was charged at 6:30 p.m., that the alternate jurors were then dismissed, and that deliberations began at 7:13 p.m. The jury presented a question at 10:41 p.m., and the parties debated about the appropriate response. During this debate, the clerk indicated that jury was hungry and "want[ed] to know about getting some food." Pizza was ordered for the jury. An answer to the jury's question was sent back at 11:13 p.m.; they resumed deliberations; and a guilty verdict was returned at 1:05 a.m. The jury was dismissed, and court was adjourned.

The Defendant raised the issue in her motion for new trial, making the following allegations: (1) "That the [c]ourt improperly denied the Defendant's Motion to Continue the case following the medical issue that arose on the 5th day prior to the jury receiving its instructions and commencement of deliberation[s]."; and (2) "That following the delay caused by a medical emergency one of the jurors exhibited fatigue by stating she 'had a nice nap.' That such statement was made to the [j]udge and a continuance should have been granted." At the motion for new trial hearing, defense counsel argued that a juror exhibited fatigue upon returning to the courtroom prior to the jury charge due to her statement that "she'd had a nice nap back there"; that it was a Thursday evening when the trial concluded, and the court "had Friday available"; that the jury went late into the evening, and "they were not prepared for the length of the stay" ; and that a continuance should have been granted in response to the defense's objection following the Defendant's medical emergency.

In response to the Defendant's argument, the trial court replied, "My recollection of those events . . . was that the jurors wanted to proceed on" after being given the option to continue deliberations or adjourn for the day; the prosecutor confirmed the trial court's recollection. The trial court also did not recall any such statement being made by a juror when the Defendant returned from the hospital, "maybe other than in jest." The prosecutor submitted that the defense did not make a motion to continue once the Defendant returned to the courtroom from the hospital, i.e., "not during the course of the night that, 'Hey, the jury's going to be fatigued, and we just need to postpone things until Friday morning.'" In conclusion, the trial court ruled,

> I do believe I asked them, did they wish to proceed. And they wanted to plow through. Because my recollection of the events, they went out about 7 p.m. to deliberate, and came back very slightly after 1 o'clock.

-17-

> I mean without more, I'm not—based on my examination of the jurors of them wanting to proceed forward, I can't imagine this had any bearing on her [the alleged napping juror's] ability to reach a verdict in this case.

Furthermore, the trial court noted that the jury deliberated for several more hours after the answer to their question was returned to them, evidencing their mental clarity.

First, we must address the State's response to the Defendant's argument. The State replies that "[t]he trial court's decision to await word on the [D]efendant's medical status was prudent under the circumstances and was within the discretion of the trial court" and, moreover, that "[t]he Defendant never objected to the nighttime jury deliberations[,]" thus, waiving the issue of the lateness of the hour. However, we decline the State's invitation to treat the medical emergency situation and late-night jury deliberations as separate occurrences requiring separate objections by the defense. As can be seen from the discussion quoted above, the defense requested a continuance until the following day due to the emergency medical situation which had arisen and asked "to adjourn . . . and start fresh in the morning[,]" maintaining that jury deliberations would not begin until around 7:00 p.m. even if the Defendant's medical condition was handled quickly at the hospital. That was precisely how the situation played out. Thus, we conclude that the issue of late-night deliberations, which resulted from the trial court's decision to await word of the Defendant's medical status, is properly before this court for our review.

Turning to the issue at hand, the leading case is Hembree v. State, 546 S.W.2d 235, 242-43 (Tenn. Crim. App. 1976), a post-conviction case, wherein the petitioners contended that they were denied the effective assistance of counsel when the trial court required counsel to try the case from 9:00 a.m. until 1:00 a.m. the next morning. The trial court refused to adjourn even when the attorneys, a few minutes before midnight, asserted that they were fatigued and not thinking clearly. Court, which was scheduled to reconvene at 9:00 a.m. the next morning, was only adjourned after all of the evidence was concluded at 1:00 a.m. This court held that the trial court erred in not adjourning at midnight, reasoning as follows:

> The Sixth Amendment guarantees to a criminal defendant the right to effective assistance of counsel at every step in the proceedings. Powell v. Alabama, 287 U.S. 45 (1932); McKeldin v. State, 516 S.W.2d 82 (Tenn. 1974). The last hour of a trial is an essential portion thereof. We hold that the [c]ourt erred in not adjourning at [m]idnight when counsel stated that they could no longer be effective and that they were not thinking clearly.

We are also mindful of the fatigue of the jurors. We think that absent unusual and compelling circumstances, the jury should not be permitted to listen to evidence until 1:00 a.m. No reasonable cause was given for proceeding until this hour and a defendant being tried for murder is not only entitled to reasonably alert counsel, but to witnesses who are reasonably alert and that the jury should likewise be clear-headed and not unduly fatigued. We think that the [Fourteenth] Amendment of the United States Constitution and [article] 1, [section] 8 of the Tennessee Constitution grants appellants these rights.

This is not to say that night sessions [p]er se are improper under unusual circumstances; however, we do hold that night sessions should be terminated at a more reasonable hour, absent consent of the parties and all members of the jury.

Before we can hold a Federal constitutional error to be harmless, we must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18 (1967); McKeldin v. State, supra. We cannot declare a belief that the error is harmless beyond a reasonable doubt and we must therefore affirm[.]

546 S.W.2d at 242-43 (emphasis added).

Reiterating the holding of Hembree, this court in State v. McMullin, 801 S.W.2d 826 (Tenn. Crim. App. 1990), stated as follows:

Late night court in criminal jury cases should be scheduled only when unusual circumstances require it, and not then if either defense counsel or any juror objects upon reasonably based grounds having to do with the lateness of the hour. Where late sessions are scheduled under the requisite unusual circumstances, good practice would be to let the record reflect the agreement of defense counsel and all jurors.

Id. at 832. Stated another way, trials should be allowed to proceed late into the night "only under unusual circumstances; and then only with the consent of the parties and all members of the jury." Id. at 830 (emphasis added).

In McMullin, the first day of trial commenced at 9:00 a.m. and did not adjourn until 11:45 p.m. that night. The second day of trial commenced at 9:20 a.m. The jury commenced deliberations that day at 9:28 p.m., and the jury verdict was received and the jury discharged at 11:50 p.m. Of the 38 hours and 50 minutes that elapsed between the commencement and the end of the trial, the court was in session all except 9 hours and 35

minutes. 801 S.W.2d at 827-28. As unusual circumstances, the trial court noted that it was a sequestered jury and that the jury was made up of twelve women; it was also noted that the trial judge had a plane reservation for the next day. Id. at 829-30. This court held,

> [T]he stressful hours involved in the trial of this case, over the protest of the defendant's counsel, without the express agreement of the jurors, and without unusual and compelling circumstances, violates the rule laid down in Hembree v. State, . . . and constituted constitutional rights deprivations of the right to counsel and the right to due process of law requiring a reversal and a remand for a new trial.

Id. at 830. In addition, the court reasoned,

> The unusual circumstances referred to in Hembree as justifying the use of night court sessions do not include the mere facts that the jury is being sequestered, and that women are on the jury, as the trial judge held. Both of those circumstances are normal in the context of trying a serious criminal case before a jury.

Id.

The "threshold question which must always be determined by the court is whether the circumstances justify the unusual session." State v. Parton, 817 S.W.2d 28, 34 (Tenn. Crim. App. 1991). When considering the ability of the jury to continue its work, "a trial judge should rely on more than tacit or even express agreement of jurors to continue. The trial judge should also use an objective test based upon his or her own judgment on the bench and experience in life dealing with the frailties of human beings." Id. at 35.

Moreover, the practice of holding court at night has been highly discouraged. This court has previously commented on the ineffectiveness of the justice system as a whole when trials are allowed to proceed into the late evening and early morning hours:

> Jurors must be alert, unhurried and comfortable in order to properly deliberate and make the important decisions with which they are confronted. Thus, sufficient out-of-court time is necessary for their rest and relaxation. By and large, jurors are unfamiliar with the mysteries and mystique of a judge, a courtroom, litigants, lawyers, and criminal law. They are hesitant to express themselves, and they may give tacit approval to an issue when actually they would like to object. Jurors can easily be coerced by the proceedings and by the trial judge. They sometimes may feel that they must rush to judgment and hurry to dispose of a case.

-20-

Lawyers can feel the same way. They do not want to irritate the judge, especially one in front of whom they practice regularly.

Jurors hesitate to complain to the court; and as neophytes to the system, they are influenced by their perception of the will of the judge. . . .

. . . .

When a trial continues into the late night, other participants do not function to their optimal abilities. The judge gets tired, whether he or she admits it. The court reporter may make transcription errors that will not show up until appellate review. Clerks, bailiffs, and other court personnel must have clear minds to properly go about their duties. Witnesses cannot perform their function to the best of their ability when they are weary after a long and stressful day. They should not have to testify when they ordinarily would be retiring. Many participants just want to get the case over with and go home. The trial judge, sitting neutral and detached, has the responsibility of ensuring that the general rule against late night sessions is not abrogated. The judge must regulate and assure that reasonable hours of litigation and jury deliberation are maintained. When the adversarial activities are concluded, the jurors' ultimate duties begin. They should very rarely deliberate into the early morning hours without proper rest.

Parton, 817 S.W.2d at 34-35 (emphasis added).

"[T]he right of trial by jury shall remain inviolate[.]" Tenn. Const. art. I, § 6. Error affecting that right "will result in such prejudice to the judicial process that automatic reversal is required." State v. Bobo, 814 S.W.2d 853, 858 (Tenn. 1991). Nevertheless, "unusual and compelling circumstances" sometimes warrant extended days in trial and late night or early morning deliberations. But, such is not the case here.

As noted above, defense counsel made a motion to recess at normal hours following the Defendant's medical emergency. Just as defense counsel feared, deliberations went long after normal working hours were completed—the verdict was not returned until 1:05 a.m.[8] Although one juror apparently had a graduation to attend the following day, that juror was excused because two alternate jurors were still available. The jury was not sequestered. Trial was not going to extend into the weekend—it was a

---

[8] The State relies upon the case of State v. Gary Mitchell Hestand, No. M2014-02208-CCA-R3-CD, slip.op. at 13-15 (Tenn. Crim. App. Oct. 7, 2015) (no Westlaw citation available). But that case is clearly distinguishable from the present scenario because proceedings in that case adjourned at around 7:00 p.m. each night, rather than proceeding late into the evening and early morning hours as they did here.

late Thursday afternoon when the defense requested a continuance due to the Defendant's medical emergency, and the court still had Friday available to it. Cf. State v. Cameron, 909 S.W.2d 836, 850-52 (Tenn. Crim. App. 1995) (finding no error in allowing trial to continue past 5:30 p.m. when closing arguments extended until about 9:30 p.m. because, although attorney indicated he was sleep-deprived, court was concerned that the jury not be sequestered over a Sunday when court could not be held, court was not held that late, and breaks were taken after counsel expressed concern over being tired); Holt v. State, 591 S.W.2d 785, 791-92 (Tenn. Crim. App. 1979) (holding that no error took place where court held late-night session until 10:05 p.m. because the unusual circumstance was the need to avoid locking up the sequestered jury and, when defense counsel complained of fatigue, trial court recessed for an hour and fifteen minutes before resuming); Seelbach v. State, 572 S.W.2d 267, 271 (Tenn. Crim. App. 1978) (determining that it was not error to hold court until 9:13 p.m. on a Friday when it was understood that trial judge had somewhere to be the following week and court was immediately adjourned when defendant's counsel pointed out the lateness of the hour). At the motion for new trial hearing, the trial court indicated that the jurors wished to continue although the trial transcript does not reflect any such polling. Irrespective of whether the jurors consented, the threshold question is whether unusual and compelling circumstances required the late-night sessions. Because defense counsel protested and because the record does not indicate that any unusual circumstances were present, we determine that a new trial is warranted in accordance with Hembree and its progeny. Cf. State v. Reid, 213 S.W.3d 792, 825-26 (Tenn. 2006) (appendix) (holding, in a capital murder trial, that unusual circumstances warranted the late night court sessions, adjourning at the latest 9:05 p.m., where the case had received extensive media attention and the trial court, therefore, had gone outside of the county to secure a jury and the jury was sequestered, "locked away from family, friends and employment until the conclusion of the trial"); State v. Hurley, 876 S.W.2d 57, 68 (Tenn. 1993) (allowing the jury to deliberate on Saturday night at 7:00 p.m. after five full days of trial was not error when the jury inquired if there were facilities available at the motel where they could deliberate further; the jury deliberated for some unstated period thereafter; and deliberations did not continue over the objections of counsel); State v. Craig, 655 S.W.2d 186, 191 (Tenn. Crim. App. 1983) (concluding, with no mention of the Hembree rule and defendant's counsel conceding the issue, that no error occurred when court was in session until 11:40 p.m. where no juror fatigue was indicated, numerous recesses were taken, adjournment was granted at time of jury's choosing, and full deliberation took place the following day); see also State v. Joel Marshall Jones, No. M2005-00619-CCA-R3-CD, 2006 WL 1063329, at *11 (Tenn. Crim. App. Apr. 21, 2006) (relying on Craig and finding no error when jury returned verdict at 3:35 a.m., reasoning that unusual circumstances were present when one juror explained that he could not meet the next day due to prior obligations; there was no indication of juror complaint or fatigue; the trial court obtained express permission from the jurors to work for extended hours; and no objection was lodged by defense counsel to

-22-

adjourn at normal hours). Despite our conclusion that the case must be reversed, we will address the remainder of the Defendant's arguments so as not to pretermit her remaining issues. See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

*III. Defendant's Statement*

The Defendant argues that the trial court erred by denying her motion to suppress her statement made to Agent Kon at the TBI's office. Specifically, the Defendant alleges that the statement was not voluntary because she was separated from Dawn upon their arrival at the TBI's office, and their driver was instructed by an agent to leave; she was sleep deprived, and the statement was made late in the evening; she was in shock over the death of her husband; and "the false pretenses under which [she] was invited to come[,]" i.e., in order to retrieve her cellular telephone, which the TBI had promised would be returned and she would then be able to leave. The State responds that the Defendant has waived plenary review of the issue by failing to include a transcript of the motion to suppress hearing in the appellate record. The State continues, waiver aside, that the issue is meritless under the circumstances surrounding the Defendant's "second statement to the TBI" because she "was treated with courtesy and never complained of fatigue."

The record evinces that the Defendant filed a motion to suppress her statements, moving to "suppress any and all statements made by the [D]efendant whether oral or written that precede[d]" her signed waiver of rights form.[9] She contended,

> Every such statement provided prior to the warnings was a custodial interrogation, wherein the Defendant did not feel free to leave the presence of the investigating officer. Moreover, the timing of the statements and the length of the interrogation overwhelmed the ability of the Defendant to comprehend the circumstances of the custody.

The trial court held a hearing on the motion to suppress and denied the motion by written order filed on October 8, 2013, concluding that the Defendant's statements were voluntary.

The State correctly notes that the transcript of the hearing on the motion to suppress is absent from the record.[10] The appellant has the duty to prepare a record

---

[9] The Defendant ostensibly only challenges on appeal the statement made at the TBI's office on August 9, 2012.

[10] The State also notes the lack of a motion for new trial hearing transcript in the record. While the original record did not include that transcript, we felt inclined to order it to adequately address the Defendant's late-night jury deliberation issue. See Tenn. R. App. P 24(e) (authorizing this court to supplement the record if deemed necessary). However, it still remains an appellant's obligation to

sufficient to allow meaningful review. Tenn. R. App. P. 24(b) (mandating that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Accordingly, the absence of the transcript of a hearing generally constitutes waiver of the issue. Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997); Ballard, 855 S.W.2d at 560-61 ("Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue."). However, where the record provides a basis for review, this court has proceeded to address the denial of a motion to suppress. See, e.g., State v. Quinzell Grasty, No. E2012-00141-CCA-R3-CD, 2013 WL 1458660, at *5-7 (Tenn. Crim. App. Apr. 10, 2013) (holding that the issue was waived but nevertheless concluding based on the trial court's order and on evidence at trial that the trial court did not err in denying the motion).

Here, the trial court made detailed findings of fact and conclusions of law in denying the Defendant's motion to suppress her statements. In denying the motion, the trial court made the following factual findings:

> [S]ometime on the 8th of August, 2012, [the D]efendant's husband was murdered. Special Agent Andrew Kon of the TBI spoke with [the D]efendant at the scene. The next day, he contacted [the D]efendant through a friend of hers as he was interested in the contents of her cell phone. [The] Defendant appeared at the Bedford County Emergency Management building, where the TBI keeps a small local office, around 9:00 p.m. She was driven there by a friend. [The] Defendant was accompanied by her daughter and co-defendant, Dawn Walls. [The] Defendant was told by [Agent] Kon she was free to leave and no matter what happened she would be free to go home. There were no handcuffs or restraints. [The] Defendant was placed in a conference room. Also present was Agent Winkler. [Agent] Kon testified the [D]efendant appeared to understand everything. She was coherent and there were no problems communicating. No Miranda warnings were given as the [D]efendant was not in custody and was not a suspect. The [D]efendant never asked to leave nor did anything to indicate she wanted to leave. [The] Defendant even went outside on at least one occasion. On cross-exam[ination], [Agent] Kon testified he first did a handwritten statement and read it to [the] Defendant for accuracy. Afterwards, it was typed and signed by the [D]efendant. . . . He further stated [the D]efendant never asked to use a

---

compile the appellate record, and we decline to assemble the entire record for her.

phone. [The] Defendant was then driven with co-defendant, Dawn Walls[,] to their car since their ride had, unbeknownst to [Agent] Kon, left the defendants.

Based on these findings, the trial court concluded as a matter of law that the Defendant's statement given to Agent Kon on August 9 and completed on 10 was admissible, reasoning,

[T]he [D]efendant came to the TBI via her own transportation about 9:00 p.m. There is no evidence this was anything other than voluntary at the request of the TBI. She was apparently there about four (4) hours with two (2) TBI agents. Certainly, the lateness of the hour and the place of the interview could weigh against the voluntary nature of the statement, but that is only one factor.

The questioning was not in a demanding or demeaning tone. [Agent] Kon testified everyone was calm and from what can be gleaned from the testimony; the tone was no more than conversational. There was no restriction on the [D]efendant's freedom of movement and, in fact, the [D]efendant, on at least one occasion, went outside. She was, also, not arrested, as promised, despite her incriminating remarks. The [D]efendant never asked to leave nor did she indicate she desired to leave.

We are compelled to note that, despite the record's being sufficient for this court to conduct meaningful appellate review of the issue, the Defendant failed to raise the issue regarding the denial of her motion to suppress in her motion for new trial, as required by Tennessee Rule of Appellate Procedure 3(e). Neither party has addressed this issue.[11] Rule 3(e) provides, in pertinent part:

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

---

[11] Although the State did note the lack of the motion for new trial transcript in the appellate record, the Defendant's suppression issue was never included in any written motion. "A motion for a new trial shall be <u>in writing or, if made orally in open court, be reduced to writing</u>, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b) (emphasis added).

Tenn. R. App. P. 3(e). Accordingly, we are precluded from reviewing this issue unless it rises to the level of plain error. See State v. Josue Segura, No. W2010-00952-CCA-R3-CD, 2012 WL 4078910, at *14 (Tenn. Crim. App. Sept. 18, 2012); State v. Frederick Darnell Alexander, No. M2011-00591-CCA-R3-CD, 2012 WL 829663, at *2-3 (Tenn. Crim. App. Mar. 12, 2012).

In determining whether an alleged trial error constitutes "plain error," we consider five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Plain error cannot be found unless the record establishes all of the elements of the Adkisson standard. Id. at 283. In order for this court to reverse the judgment of the trial court, we must conclude that the error involved a substantial right and "more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b); State v. Yoreck, 133 S.W.3d 606, 611 (Tenn. 2004).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." See also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." "The significant difference between these two provisions is that the test of voluntariness for confessions under [a]rticle I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent conducts a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action

in any significant way." Miranda, 384 U.S. at 444. A person is "in custody" within the meaning of Miranda if there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quotation omitted). The Court has refused to extend the holding in Miranda to non-custodial interrogations. See Oregon v. Mathiason, 429 U.S. 492 (1977) (holding that an accused's confession was admissible because there was no indication that the questioning took place in a context where his freedom to depart was restricted in any way); see also Beheler, 463 U.S. at 1124-25 (noting that the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest).

A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order to effect a waiver, the accused must be adequately apprised of his right to remain silent and the consequence of deciding to abandon the right. State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). In determining whether a reasonable person would consider himself or herself in custody, our supreme court considers a variety of factors, including the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

State v. Walton, 41 S.W.3d 75, 82-83 (Tenn. 2001) (quoting State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996)).

The "pivotal question" before the trial court in the present case was "whether there [was] a formal arrest or, at least, the restraint of freedom of movement to be the functional equivalent thereof." The trial court then reviewed the factors outlined above and concluded that the Defendant was not "in custody" when she made "the statements . . . to Agent Kon on . . . August 9th and 10th, 2012[,]" and the statements were, thus, admissible.

The Defendant does not make any argument on appeal that she was "in custody" as contemplated by Miranda at the time she made her statement to Agent Kon. Instead, she now argues that her confession was not voluntarily given, without any mention of its custodial or non-custodial nature. A non-custodial interrogation must be voluntary in order to be admissible. Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible. Rogers v. Richmond, 365 U.S. 534, 540 (1961). In order to make the determination, the particular circumstances of each case must be examined. Monts v. State, 400 S.W.2d 722, 733 (1966). Coercive police activity is a necessary prerequisite in order to find a confession involuntary. State v. Downey, 259 S.W.3d 723, 733 (Tenn. 2008). A confession "must not be the product of 'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" Downey, 259 S.W.3d at 733-34 (quoting State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000)).

Promises of leniency, however, do not necessarily render a confession involuntary; instead, the critical question is whether law enforcement's actions were of a nature to overbear the defendant's will to resist. State v. Smith, 933 S.W.2d 450, 456 (Tenn. 1996). The court must determine "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Hunter v. Swenson, 372 F.Supp. 287 (W.D. Mo. 1974)). Factors in determining voluntariness include the age of the accused; her level of intelligence and education; her prior experience with law enforcement; repeated and prolonged nature of the questioning; the length of the detention prior to obtaining the statement; the lack of any advice to the accused of her constitutional rights; whether there was an unnecessary delay in bringing her before a magistrate before she gave the confession; whether the accused was injured, intoxicated, drugged, or in ill health; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013).

The factors to be considered in this second analysis, while there may be some overlap, are not the same. See State v. Phillips, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (first, concluding that the defendant was not in custody for purposes of Miranda, and then, proceeding to examine the voluntariness of the non-custodial confession). Thus, the Defendant has, for all intents and purposes, changed theories on appeal. "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001); see also State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). This court may consider only the arguments presented to the trial court as to why the statement should have been suppressed. Moreover, there is no evidence in the record that the Defendant was intimidated, coerced, threatened, or otherwise induced into making the

statement. For these reasons, we conclude that consideration of the error is not necessary to do substantial justice, and plain error review is not warranted.

## IV. Phone Records

Next, the Defendant argues that the trial court erred in allowing certain phone records to be admitted into evidence, in violation of Rule 16 of the Tennessee Rules of Criminal Procedure, when those records were not timely disclosed. The Defendant first argues that exclusion of the records was the proper remedy but, alternatively, that the trial court should have granted her request for a continuance to permit time to examine, verify, or subpoena other relevant and exculpatory records. The Defendant submits that "[t]he court's sanction was nonexistent in this matter providing only a weekend to review the matter, an insufficient amount of time to obtain further phone records prior to the testimony of any witness."

On April 29, 2014, the Defendant filed a "Motion in Limine to Exclude Introduction of or Reference to Texts or Records of Texts or in the Alternative to Continue the Trial Scheduled for 1 May 2014." The Defendant contended therein, "The lateness of the production of this evidence to the defense substantially prohibits full investigation into the authenticity of the content or the author of any of these text messages." The Defendant continued, asserting that her case was substantially prejudiced "without the ability to examine the messages provided, the completeness of the record provided and further existence and content of any other messages that might tend to exonerate the [D]efendant." The Defendant stated that the "discovery provided by the State on 29 April 2014" was attached. The only item attached is the State's amended proposed witness list, which listed the Verizon Wireless Keeper of Records as a potential witness. No written disposition of this motion appears in the technical record.

The State argues that the issue is waived because there is no transcript of the hearing on the Defendant's motion in limine. We agree, again noting that the appellant has the duty to prepare a record sufficient to allow meaningful review. See Tenn. R. App. P. 24(b); Ballard, 855 S.W.2d at 560. Moreover, we note that the Defendant fails to make any citation to the trial record regarding the admission of the offending phone records, thereby, forcing us to scour the record for any relevant discussion. The failure to make appropriate references to the record in the argument section of the brief as required by Rule 27(a)(7), Tennessee Rules of Appellate Procedure, constitutes further waiver of the issue. See also Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citations to authorities, or appropriate references to the record will be treated as waived by this court."). Thus, the issue is again only reviewable for plain error. See Tenn. R. App. P. 36(b).

Following Dawn's testimony about the content of the text messages exchanged between her and her mother on August 8, 2012, the State moved to introduce those phone records as an exhibit—a printout of those messages in chronological order. Defense counsel simply "note[d] [hi]s previous objection to that[.]" The trial court replied, "Okay, I think we addressed that Thursday morning, did we not?"[12] and defense counsel gave an affirmative response. The records were then entered as an exhibit.

During cross-examination of the Verizon Wireless records custodian, defense counsel inquired about text messages sent between the Defendant and Aelisa's phone[13] during the same timeframe—the morning hours of August 8, 2012. That text message exchange was as follows:

The Defendant: Do you have dads phone

Aelisa: Yes way

The Defendant: Dad wants to know why you took his phone

Aelisa: Chris had it in his packet

Records of these text messages were entered as an exhibit by the defense, and because the records custodian had not reviewed them prior to trial, the trial court issued an instruction verifying their authenticity.

TBI Special Agent Nicholas Christian testified as an expert in cell phone forensics. Agent Christian examined Dawn Walls' cellular telephone and was able to extract details of the text messages Dawn sent to her mother on August 1 via Aelisa's phone and on August 8 to the Defendant's phone. Agent Christian's reports of these exchanges were entered into evidence.

The Defendant raised the discovery violation as an issue in her motion for new trial. Defense counsel noted that the complete phone records were not received by the defense until the week of trial; that the defense did not have time to investigate Aelisa's phone records; that the State indicated, at the motion to suppress hearing, no phone records would be used against the Defendant at trial; and that many of the State's witnesses testified regarding the phone records, which underscored their importance to the State's case.

Defense counsel offered the following temporal information at the motion for new trial hearing:

___

[12] Thursday would have been May 1, 2014.

[13] Aelisa was now in possession of her own phone.

We had two days to look over—two days that we had, to look over the information, from the time the State presented it to us until the time we began picking the jury. And we argued about it after we picked the jury.

And you said I could have the weekend, we would start the trial on Monday. And so I looked over it over the weekend to try to put forth the best case I could with what I had.

But there's no way I could get a subpoena issued for A[elisa] Stacy's phone records at that point.

Defense counsel argued that the critical text messages used "to convict" his client came from Aelisa's phone and that they did not have time to obtain and review Aelisa's phone records. According to defense counsel, although he had issued a subpoena for Aelisa's phone records, he still had not received them by the time of the motion for new trial hearing.

The prosecutor replied that there was nothing in the phone records that were turned over just before trial began "that benefitted the defense[,]" that all were "either neutral or prejudicial." The prosecutor further argued that the Defendant had failed to establish any prejudice due to the delay, noting that the defense was also allowed to introduce a portion of the phone records into evidence, and that the Verizon Wireless records custodian testified that text messages were only available for a short period of time, and therefore, such records were likely no longer available. The trial court ruled on the issue, "As far as the phone records are concerned, I'm just not convinced it would have made any difference. There was considerable other proof."

Rule 16(a)(1)(F) of the Tennessee Rules of Criminal Procedure provides as follows:

Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Tennessee Rule of Criminal Procedure 16(d)(2) provides guidance for dealing with claimed discovery violations:

> Failure to Comply with a Request. If a party fails to comply with this rule, the court may:
>
> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;
>
> (B) grant a continuance;
>
> (C) prohibit the party from introducing the undisclosed evidence; or
>
> (D) enter such other order as it deems just under the circumstances.

"Thus, it is clear that the court has wide discretion to fashion a remedy that is appropriate for the circumstances of each case and the sanction must fit the circumstances of that case." State v. Dennie Ray Loden, No. 03C01-9311-CR-00380, 1995 WL 23351, at *2 (Tenn. Crim. App. Jan. 19, 1995) (citing State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984)); see also State v. Leon Goins, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App. Dec. 27, 1999). Moreover, this court has previously determined that "evidence should not be excluded except when it is shown that a party is actually prejudiced by the failure to comply with the discovery order and that the prejudice cannot be otherwise eradicated." State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981).

Here, based upon the comments of the defense attorney at the motion for new trial hearing, it appears the trial court granted a continuance for the defense to review and inspect the records, albeit only a weekend. Curative measures for discovery violations under Rule 16(d) are discretionary with the trial court. Absent a transcript we can only speculate why the trial court chose this sanction. See Smith, 24 S.W.3d at 282 ("[T]he record must clearly establish what occurred in the trial court[.]"). Moreover, based upon the sanctions available for discovery violations, we believe the trial court resolved the dispute in a reasonable fashion. See id. ("[A] clear and unequivocal rule of law must have been breached[.]"); see also Tenn. R. Crim. P. 16(d)(2). Additionally, we concur with the trial court's determination that the Defendant has failed to demonstrate how having these records any earlier would have assisted in further preparing a defense. See Smith, 24 S.W.3d at 282 ("[A] substantial right of the accused must have been adversely affected"; and "consideration of the error is necessary to do substantial justice."). Dawn and Aelisa were thoroughly cross-examined about the text messages; the trial court issued an instruction authenticating the additional phone records when the Verizon custodian had trouble doing so; and the defense was able to introduce beneficial text messages from

the discovery provided. The Defendant has not established her entitlement to plain error review.

## V. <u>Jencks</u> Act Violation

The Defendant argues that the trial court abused its discretion in denying her motion for a mistrial or to strike Aelisa's testimony based on the State's alleged violation of Tennessee's version of the <u>Jencks</u> Act. Specifically, the State failed to produce a recording of a phone call between Aelisa Stacy and Joseph Williams until two days after Aelisa had first testified. According to the Defendant, the State failed to exercise due diligence in obtaining the recording; the <u>Jencks</u> Act violation prohibited an effective cross-examination of Aelisa, who the defense "believed . . . to be the actual perpetrator of the offense and her credibility was at issue throughout the trial"; and the trial court's remedy "allowed for limited cross-examination by the defense two days after the original testimony[,]" and "[a]fter which[,] the State was not limited in its redirect, despite objection by the defense." The State responds that the trial court's remedy, to allow Aelisa to be recalled and cross-examined about the statement she made during the phone call, was within the proper discretion of the trial court. We agree with the State.

At the conclusion of Aelisa's testimony the defense requested any <u>Jencks</u> Act material. At that time, the Defendant received an August 12, 2012 statement made by Aelisa to law enforcement, wherein Aelisa stated that her mother asked Dawn if she was "sure [she] want[ed] to do it[,]" to which Dawn said, "[N]o." According to Aelisa, her mother replied that "[s]omething had to be done." Dawn then asked her mother if "she was going to be able to pay the rest of the money[,]" to which the Defendant said that "[s]he didn't know."

The State presented four more witnesses before Agent Kon testified. Agent Kon testified on cross-examination that there was a recording of an August 9, 2012 phone call placed by Joseph Williams to Aelisa Stacy and that the call was made "to gather information to see if [Aelisa] knew more about her father's death." According to Agent Kon, "there was conversation [between the two during the phone call], but it did not pertain to the death of [Aelisa's] father."

At a bench conference following Agent Kon's testimony, defense counsel raised a <u>Jencks</u> Act violation, arguing that the State had failed to produce of copy of the recorded telephone conversation between Aelisa and Williams, which took place just a little over twenty-four hours after the murder. The trial court did not issue a ruling at that time, taking time to think on the matter, and the proof continued.

Later during trial, the court asked if the State had listened to the recording. The prosecutor could not recall listening to such a recording, but he stated that he would look

for it and would listen to it, if found, and determine "[i]f anything [came] up about the death of [the victim.]" Trial recessed until the following day.

The next morning, the prosecutor informed the court that it had turned the complete recording over to the defense. The prosecutor described the contents of Aelisa's statements to Williams on the tape:

> [I]t's a conversation between the two of them. They are talking about kind of the murder. I mean in other—they're—in other words, but it's not you know, well, I mean the subject matter is the fact that her father has been murdered. The subject matter that possibly the [D]efendant and Dawn are suspects comes up. The subject matter of [Aelisa], who's crying pretty much throughout the conversation, being incredibly upset about the loss of her father is discussed.

Defense counsel claimed that there was "an important statement" on the recording—"when questioned by [Williams] whether or not [Aelisa] thought her mother was involved, she said, no, she didn't think her mother was involved, at all, that she didn't have anything to do with it[.]" Defense counsel continued,

> [Aelisa's] testimony was on the stand that . . . the night before the murder she was involved in a conversation at the swing set with [the Defendant], Dawn and her and those are the only three people out there and they were talking about the murder going to take place the next day.
>
> . . . .
>
> . . . And her statement on that disc should have been able to be produced against her, her own words the day after the murder where she said, no, I don't think my mother was involved. Her testimony on the stand was they were planning it the night before and [the Defendant] was there. . . . I think that that's necessary to cross her with when she's on the stand.

Defense counsel claimed that recalling Aelisa would not "have the same effect" two days later as it would have had earlier when she was first cross-examined.

The trial court determined that Tennessee Rule of Evidence 613(c) permitted, for impeachment purposes, the defense to cross-examine Aelisa about her prior inconsistent statement and that the recorded phone call was, therefore, "fair game[,]" i.e., was material that should have been turned over to the defense.[14] Defense counsel moved "for a

---

[14] The trial court never definitively determined that a Jencks Act violation occurred.

mistrial based on the [S]tate's failure to produce this evidence in a timely fashion[.]" The trial court denied that motion, noting that Aelisa was "cross-examined pretty hard" and that this evidence related to "the question of believability[.]" Defense counsel then requested that Aelisa's testimony be stricken entirely and that the jury be instructed accordingly. The trial court believed that was "way too harsh" of a remedy, reasoning that "there [was] plenty of other evidence that [the jury] could have considered that [did not] necessarily pertain to the particular statement." In fashioning "a practical and fair solution," the trial court concluded that the defense could recall Aelisa "for the limited purpose" of asking her about the statement she made during the phone call.

Aelisa was recalled. She agreed that she stated to Williams during their phone conversation that she did not think her mother "had anything to do with" the murder. Because Aelisa admitted to making the statement, no extrinsic proof of the statement was permitted under Tennessee Rule of Evidence 613(b). On cross-examination, the State was allowed to explore the "circumstances surrounding [Aelisa's] statement[.]" Aelisa testified that she said this to Williams prior to her conversation with the Defendant at Tasha Groves's house on the evening of August 12, 2012, when the Defendant confirmed her involvement in the victim's murder. On redirect, defense counsel asked Aelisa about her earlier testimony regarding the conversation that took place at the swing set on the evening of August 7, 2012, just prior to the murder. Aelisa explained that she "didn't believe her mother at the time" of the swing set conversation, and therefore, she still did not think her mother was involved at the time she spoke to Williams on the phone.

The Defendant did raise the issue in her motion for new trial, arguing that the State "failed to exercise due diligence in discovering, obtaining and disclosing" the Jencks Act material and that "the timeliness of its disclosure prejudiced the [D]efendant." The trial court determined that the failure by the State to disclose the statement earlier was "inadvertent." The trial court also concluded that "the jury did get to hear the information" despite the timing issue, indicating that the Defendant had failed to establish prejudice.

Tennessee Rule of Criminal Procedure 26.2(a) requires that,

[a]fter a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

A statement is defined as:

(1) A written statement that the witness makes and signs, or otherwise adopts or approves; or

(2) A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement.

Tenn. R.Crim. P. 26.2(f). Sanctions for failure to produce the statement may include striking testimony or declaring a mistrial. Tenn. R. Crim. P. 26.2(d). Tennessee Rule of Criminal Procedure 26.2, commonly known as the codification of the Jencks Act, emanates from the United States Supreme Court's decision in Jencks v. United States, 353 U.S. 657, 668 (1957), which gave the defendant a right to inspect prior statements of government witnesses which were related to the witnesses's testimony on direct examination. State v. Caughron, 855 S.W.2d 526, 534-35 (Tenn. 1993). "The purpose of Rule 26.2 is to enable counsel to examine a witness's statements in order to test the credibility of that witness at trial." Id. at 535.

The State has a duty to exercise due diligence in obtaining a statement and providing it to the defense. State v. Cannon, 661 S.W.2d 893, 899 (Tenn. Crim. App. 1983) (citing State v. Hicks, 618 S.W.2d 510, 514 (Tenn. Crim. App. 1981)). "The prosecutor's duty to disclose extends not only to material in his or her immediate custody, but also to statements in the possession of the police which are normally obtainable by 'exercise of due diligence,' that is, a request to all officers participating in the investigation or preparation of the case." Hicks, 618 S.W.2d at 514 (citations omitted). Rule 26.2(d) sanctions do not rest upon a showing of bad faith, and even the "unintentional withholding or destruction of statements, regardless of motive, may be viewed as a violation of Rule 26.2 for which appropriate sanctions may be applied." State v. Jim Inman, No. 03C03-9201-CR-00020, 1993 WL 483321, at *12 (Tenn. Crim. App. Nov. 23, 1993).

The State does not discuss Rule 26.2 on appeal, only citing to the general discovery provisions of Rule 16, Tennessee Rules of Criminal Procedure. This is possibly because, as the prosecutor argued before the trial court, the phone recording was not a statement subject to Rule 26.2. We must agree with the prosecutor.

Because Tennessee Rule of Criminal Procedure 16 "substantially conforms" to federal discovery Rule 16, and because Tennessee Rule of Criminal Procedure 26.2 "is similar to the language in Rule 26.2 of the Federal Rules of Criminal Procedure[,]" we will construe these rules consistently with their federal counterparts. See Tenn. R. Crim. P. 16, Advisory Comm'n Cmts.; Tenn. R. Crim. P. 26.2, Advisory Comm'n Cmts. Except as provided by the Jencks Act, statements made by state government witnesses are not subject to discovery or inspection. Tennessee Rule of Criminal Procedure

16(a)(2) excludes from Rule 16's coverage "statements made by state witnesses or prospective state witnesses." Although there is little case law defining the term "statement" as used in Rule 16(a)(2), there is ample authority defining the scope of a statement covered by the Jencks Act. See United States v. Urena, 989 F. Supp.2d 253, 259 (S.D.N.Y. 2013).

The Federal Circuits have instructed that Jencks Act "material is, by its very nature, a recitation of past occurrences." United States v. Percevault, 490 F.2d 126, 131 (2d Cir. 1974); accord United States v. Kimoto, 588 F.3d 464, 491 (7th Cir. 2009) (describing a statement subject to 18 U.S.C.A. § 3500[15] as "'a recorded recital of past occurrences made by a prospective prosecution witness'" (quoting United States v. Sopher, 362 F.2d 523, 525 (7th Cir. 1966))); United States v. Skillman, 442 F.2d 542, 553-54 (8th Cir. 1971) (concluding same); Davis v. United States, 413 F.2d 1226, 1231 (5th Cir. 1969) (following Sopher). For this reason, Jencks Act material includes recordings of confessions, Percevault, 490 F.2d at 127-28, because they are inherently retrospective accounts of past occurrences, and statements to government agents and investigators, see Goldberg v. United States, 425 U.S. 94, 102 (1976), but it does not include "a concurrent tape recording of a conversation between the payer and the recipient of an alleged cash bribe," Sopher, 362 F.2d at 525, or a recording of a phone call between co-conspirators about an on-going conspiracy, Skillman, 442 F.2d at 549, 553. As the Seventh Circuit has explained, the latter recordings are not "statements" covered by the Jencks Act because they are "preservation[s] of a conversation just as it was spoken," not "recital[s] of past occurrences." Sopher, 362 F.2d at 525.

In light of the authority defining Jencks Act material as inherently capturing "recitation[s] of past occurrences," Percevault, 490 F.2d at 131, the tape recording of the phone call between Aelisa and Williams, wherein the only relevant statement is Aelisa's opinion that her mother was not involved in the crime, does not qualify as a statement for purposes of Tennessee Rule of Criminal Procedure 26.2. However, as delineated in the section above, Tennessee Criminal Procedure Rule 16(a)(1)(F) sets out the rights of an indicted criminal defendant to production of documents and objects from the State. Treating it as subject to Rule 16 enables defendants to have access to potentially admissible statements early enough to aid in the preparation of their defense. See Urena, 989 F. Supp. at 260.

A defendant may request "books, papers, documents, photographs, tangible objects, buildings, or places or copies of portions thereof[.]" Tenn. R. Crim. P. 16(a)(1)(F). The government must produce a requested item if it is "within the state's possession, custody, or control" and either "(i) the item is material to preparing the

---

[15] Congress placed in the federal criminal rules the substance of what is now 18 United States Code Annotated section 3500 (the Jencks Act). Fed. R. Crim. P. 26.2, Advisory Comm. Notes.

defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Id. An item is "material to preparing the defense" under Rule 16 "if it could be used to counter the [g]overnment's case or bolster a defense." United States v. Stevens, 985 F.2d 1175, 1180-81 (2d Cir. 1993). Although Rule 16 does not specifically enumerate recordings of phone calls as an item within its scope, such recordings, whether embodied in tapes or compact discs or elsewhere, are, at a minimum, "tangible objects" which the defendant may request. See United States v. Terry, 702 F.2d 299, 312-13 (2d Cir. 1983) (treating tapes of conversations as tangible objects covered by Federal Rule 16); United States v. Martinez, 844 F. Supp. 975, 982 (S.D.N.Y. 1994) ("[T]elephone records are discoverable objects to which the defendant is entitled."); United States v. Feola, 651 F. Supp. 1068, 1144 (S.D.N.Y. 1987) ("[T]elephone records are clearly included under this rule as discoverable objects to which defendants are entitled.").

The important question is whether the recording of the phone call was properly considered relevant under Rule 16. In State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059 (Tenn. Crim. App. June 28, 2002), this court interpreted the meaning of "material" in Rule 16 of the Tennessee Rules of Criminal Procedure. We stated as follows:

> "'Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case . . . . There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" United States v. Buckley, 586 F.2d 498, 506 (5th Cir. 1978) (quoting United States v. Ross, 511 F.2d 757, 762-63 (5th Cir. 1975)) (additional citations omitted). . . . This court has previously defined the phrase "material to the preparation of the defendant's defense" using this definition: a tangible object under Rule 16(a)(1)[(F)][16] is material "'if there is a strong indication that [the evidence] will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment and rebuttal.'" State v. Hershel Clark, No. 02C01-9112-CR-00273, [1993 WL 188052, at *6] (Tenn. Crim. App. June 2, 1993) (quoting [United States v.] Felt, 491 F. Supp. [179,] 186 [(D.D.C. 1979)]).

Huskey, 2002 WL 1400059, at *59-60 (emphasis added). Relying on this definition of material, we agree with the trial court that Aelisa's opinion statement on the recording was "fair game" for impeachment purposes and was, thus, discoverable evidence under Rule 16.

---

[16] Under the version of the Rule in effect at this time, the cited section was (a)(1)(C).

Still, as noted in the section above, curative measures for discovery violations under Rule 16(d) are discretionary with the trial court. Certainly, allowing the witness to be recalled and cross-examined about the statement was a proper use of this discretion by the trial court, even if it did occur two days after the witness originally testified. We again conclude that the trial court resolved the dispute in a reasonable fashion. See Tenn. R. Crim. P. 16(d)(2). Consequently, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for mistrial or to strike Aleisa's testimony. Moreover, we note that, even if the statement did qualify as Jencks Act material, the harmless error rule governs, see State v. Derrick Bland Becton, No. 02C01-9109-CR-00192, 1993 WL 1862, at *5 (Tenn. Crim. App. Jan. 6, 1993), and any violation was cured when the court permitted the defense to recall Aelisa, see State v. Timmy Fulton, No. 02C01-9706-CC-00223, 1998 WL 188532, at *4 (Tenn. Crim. App. Apr. 21, 1998). This issue is without merit.

*VI. Modification of Jury Instruction*

The Defendant contends that the trial court erred by modifying the jury instructions—inserting the theory of criminal responsibility into the charged offense of first degree murder—following the commencement of deliberations "when such modification of those instructions affected the outcome of the verdict." The Defendant explains that "[t]he improper instructions had an immediate effect on the jury decision noted in the short time period form the modified instruction to the verdict, compared to the lengthy deliberations prior to the question." The State argues that the trial court properly instructed the jury. We again agree with the State.

During the jury charge, the trial court instructed the jurors on criminal responsibility and first degree murder as follows:

T.P.I—Crim. 3.01 Criminal Responsibility for Conduct of Another

The defendant is criminally responsible as a party to the offense(s) of first degree murder or any lesser included offense if the offense(s) was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant(s) solicit(s), direct(s), aid(s), or attempt(s) to aid another person to commit the offense.

-39-

Before you can find the defendant(s) guilty of being criminally responsible for said offense(s) committed by the conduct of another, you must find that all the essential elements of said offense(s) have been proven by the state beyond a reasonable doubt.

Criminal responsibility is not a separate criminal charge but an alternate theory of criminal liability of the indicted charge or any lesser included offenses on the part of the defendant.

T.P.I.—Crim. 7.01 First Degree Murder

Any person who commits the offense of first degree murder is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victim: Larry Walls, Sr.; and

(2) that the defendant acted intentionally. A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim; and

(3) that the killing was premeditated.

A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.

After the trial court read the jury instructions, deliberations commenced at 7:13 p.m.

At 10:41 p.m., the jury submitted the following question to the trial court, "We are unsure of the combined definitions of criminal responsibility and first degree murder (T.P.I.—Crim. 7.01). Do we have to consider all of the 'ands'?" After discussion with both parties, the trial court, over the Defendant's objection, returned the following written answer to the jury at 11:13 p.m.:

Yes, you must consider all three elements in T.P.I.—Crim. 7.01. The State must prove beyond a reasonable doubt the existence of the following essential elements:

1. That the defendant or someone for whom the defendant is criminally responsible killed the alleged victim, Larry Walls; and

2. That the defendant or someone for whom the defendant is criminally responsible acted intentionally. A person acts intentionally when it is a person's conscious objective or desire to cause the death of the alleged victim; and

3. That the killing was premeditated.

Please review T.P.I.—Crim. 3.01 for an explanation of criminal responsibility.

The jury thereafter returned its verdict at 1:05 a.m.

The Defendant does not now, nor did she at trial, argue that the supplemental instruction was an inaccurate statement of the law, only that the change was "material." The Defendant's objection was that by combining portions of the instructions, the trial court was "explaining the [S]tate's theory to [the jury], which [was] the [S]tate's job to do, their obligation[.]" Defense counsel suggested that the trial court simply answer "that the two [instructions] are to be read together and that the ands are important" and also to rewrite the last paragraph of the criminal responsibility instruction already given. The trial court responded that it felt obligated "to make sure [the jury was] not confused on criminal responsibility versus first degree murder." The trial court opined that the supplemental instruction brought "a little bit more clarity to that particular situation."

On appeal, the Defendant argues that Tennessee Rule Criminal Procedure 30 permits the trial court to give additional instructions or repeat certain instructions in response to a jury's question during deliberations, but it does not authorize a modification

of instructions already given. However, Rule 30(d)(2)[17] deals with the timing of the jury charge before and after closing argument, but the rule does not address a trial court's authority to instruct once deliberations have commenced. It is well-settled law that a trial judge has the authority to give supplemental instructions in response to a question propounded by the jury. State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995); State v. McAfee, 737 S.W.2d 304, 307 (Tenn. Crim. App. 1987); Leach v. State, 552 S.W.2d 407, 408 (Tenn. Crim. App. 1977). There is ample authority to support this time-tested rule. See Laury v. State, 215 S.W.2d 797, 798 (Tenn. 1948); State v. Badgett, 693 S.W.2d 917, 920 (Tenn. Crim. App. 1985); State v. Hayes, 631 S.W.2d 450, 451 (Tenn. Crim. App. 1981).

This court "must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." Forbes, 918 S.W.2d at 447. The better procedure is to admonish the jury not to place undue emphasis on the supplemental instruction and to consider it in conjunction with the entire charge, although it is not necessarily reversible error to fail to do so. State v. Chance, 778 S.W.2d 457, 461-62 (Tenn. Crim. App. 1989).

Despite the Defendant's referring to the trial court's instruction as a "material" modification of the criminal responsibility and first degree murder instructions already given, it was in fact an accurate supplemental instruction in response to the jury's question. Moreover, the trial court did admonish the jury not to place undue emphasis on this instruction. Accordingly, we conclude that the trial court did not err. See., e.g., State v. Lamario Sumner, No. W2005-00122-CCA-R3-CD, 2006 WL 44377, at *5-6 (Tenn. Crim. App. Jan. 6, 2006) (holding that supplemental instruction further explaining the concept of criminal responsibility was not error).

## CONCLUSION

In accordance with the foregoing reasoning and authorities, we reverse the judgments of the trial court and remand the case for a new trial.

_____
D. KELLY THOMAS, JR., JUDGE

---

[17] In pertinent part, Tennessee Rule of Criminal Proceduere 30(d)(2) provides as follows: "The court may instruct the jury on the applicable law before or after closing argument. After closing argument the court may repeat all or part of the instructions that were given before closing argument. The court may also give additional instructions concerning organizational and related matters after closing argument."